UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-80175-Cr-Ryskamp/Hopkins

UNITED STATES OF AMERICA,

       Plaintiff

vs.

DON ROBERT ALLEN,

       Defendant.

_____/

```
FILED by ___JM___ D.C.

AUG 2 6 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.
```

## REPORT AND RECOMMENDATION AS TO COMPETENCY

This case raises the question of the legal competency of a deaf individual who has a strong command of American Sign Language ("ASL") and no substantial cognitive impairments but who has difficulty understanding legal vernacular due to his unfamiliarity with the criminal justice system and the fact that legal words do not translate well into ASL; he also suffers from depressive symptoms. The Government's expert opines that Defendant Don Robert Allen is competent to stand trial but recommends that individuals working with Allen make certain reasonable accommodations, such as using simple vocabulary and repetition and redirecting his attention when needed. The Defendant's experts opine that Allen is incompetent to stand trial barring competency restoration training geared towards deaf individuals. After having carefully considered the evidence adduced at the competency hearing, the contentions of the parties, and the applicable law, this Court **RECOMMENDS** that Allen is competent to stand trial because his deficiencies can be reasonably accommodated through, *inter alia*, the aid of an ASL interpreter, assistance of defense counsel, and their collaborative effort. In support thereof, the Court makes the following findings and recommendations:

## BACKGROUND

On December 7, 2010, Defendant Don Robert Allen was charged in an Indictment with distribution of child pornography, in violation of 18 U.S.C. § 2252.  The Assistant Federal Public Defender for Allen filed a Notice of Defendant's Incompetence, along with the competency evaluation of Dr. Michael P. Brannon, Psy.D., who opined that Allen is incompetent due to symptoms of depression and linguistic difficulties associated with his deafness.  (DE 22.)  Upon the Government's unopposed motion, this Court entered an order directing the Bureau of Prisons to conduct a competency evaluation.  (DE 32.)  Dr. Lisa B. Feldman, Psy.D., conducted the evaluation and concluded that Allen is competent to stand trial and is not legally insane.

At a two-day competency hearing held on June 21, 2011 and August 1, 2011, which lasted a total of approximately thirteen hours, this Court heard testimony from Dr. Lisa B. Feldman, Psy.D., and Detective Charles Ramos, who were called by the Government, and Dr. Michael P. Brannon, Psy.D., Dr. Delvena Thomas, D.O., M.P.H., and Dr. David M. Feldman, Ph.D, who were called by the defense.  There were three ASL interpreters present at the hearing, one of whom interpreted the proceedings for Allen and sat in front of Allen, one of whom interpreted the dialogue between Allen and his defense counsel and sat at defense counsel's table, and one of whom provided relief to the interpreter who interpreted the proceedings.  In addition, at the second day of the hearing, real time transcription of the hearing was made available to Allen on a monitor located on defense counsel's table.  The matter is ripe for review.

## FINDINGS OF FACT

### A.    The Defendant's General Background

Don Robert Allen is a sixty-three-year-old male who was born deaf.  Allen attended

school at the Florida School for the Deaf and Blind through at least the fourth grade.[1] He has a good command of ASL and reads at approximately a fourth- to sixth-grade reading level. He is unmarried with no children. Allen has resided alone for the past twenty-one years. He operates a personal computer and uses the Internet and a file-sharing program. In the past Allen was employed as a dishwasher at four or five restaurants and worked on a Naval Base stocking food, although he has not worked in the last three years.

**B.     The Current Charges and Execution of the Search Warrant**

Allen is charged with distribution of child pornography. On December 9, 2010, law enforcement officers executed a search warrant at Allen's residence. Allen initially indicated to law enforcement, through an interpreter, that he did not have any images of child pornography on his computer. However, upon being shown a transcript of a chat between an undercover agent and Allen, Allen became visibly upset and briefly stopped communicating. Allen's sister arrived at the residence and communicated with Allen via pad and paper. Allen's sister reportedly asked Allen whether he knew child pornography was wrong, and Allen slightly nodded his head and looked away.

The law enforcement team that executed the search reported that the "stench" coming from Allen's residence could be smelled about twenty feet from the front door of the residence. In the residence, Allen's toilet was inoperable, and feces and urine surrounded the bathtub. The refrigerator contained spoiled food. The team found food and clothing strewn about the

---

[1] The record is unclear as to Allen's education level. While Allen reported to Dr. Brannon that he competed the fourth grade, and indicated to Dr. David Feldman that he was expelled from school after the fourth grade, a review of his educational records indicate that Allen was enrolled in school for all or part of the first through sixth grades.

residence.  One officer observed a heavily malnourished dog in Allen's yard, and a neighbor reported that two dogs in his yard had died due to starvation.

## C.    The Experts' Views on the Defendant's Competency to Stand Trial

Dr. Michael P. Brannon, Psy.D., testified on behalf of the Defendant.  The Court recognized Dr. Brannon as an expert in forensic psychology.  As part of his competency evaluation of Allen, Dr. Brannon interviewed Allen on two occasions for a total of 3.5 to 4 hours and reviewed the following materials: a description of the charges, police reports, a videotape of Allen's reaction during execution of the search warrant, jail medical records, his arrest and educational history, and research articles relating to the hearing-impaired.  He spoke with correctional officers and Allen's brother, David Fuller.  As part of his interview, Dr. Brannon conducted his own structured competency interview and administered the following two objective tests: (1) the MacArthur Competence Assessment Tool-Criminal Adjudication, also known as the MacCAT-CA ("MacArthur test"), which is a legal competency structured interview; and (2) the Dot Counting Test, which is a test that assesses effort.  In addition, Dr. Brannon was the only evaluator who had the opportunity to observe Allen's interactions with his defense attorney, who was present at the second interview.  Based upon his evaluation, Dr. Brannon concluded that Allen is not competent to proceed to trial based upon his diagnoses of Major Depressive Disorder and linguistic incompetence.  He opined that Allen has the ability to understand factual information about the proceedings against him but lacks familiarly with complicated legal terms and has difficulty rationally appreciating and applying information to the facts of his case.  He testified that Allen's thought-processes are sometimes disorganized in that he contradicts himself, rambles, becomes easily side-tracked, and has difficulty discerning

4

relevant from irrelevant material, all of which would be problematic for testifying relevantly and communicating with his attorney. In addition, he testified that persons with depression sometimes lack the motivation or energy to assist in their defense, and he was concerned about Allen's ability to interact with defense counsel when frustrated. Dr. Brannon qualified that while Allen's intelligence was below average, he did not have any concern about Allen's intelligence for purposes of competency and thus did not administer any kind of IQ test, nor did he administer any kind of psychological or personality test. Dr. Brannon testified that Allen might benefit from competency restoration training in that he could learn the skills to apply the factual information that he already knows.

Dr. David M. Feldman, Ph.D., also testified on behalf of the Defendant. The Court recognized Dr. David Feldman as an expert in forensic psychology. Dr. David Feldman has received specialized training and written scholarship about the deaf. Among other competency evaluations, Dr. David Feldman has conducted approximately twenty-five evaluations on prelingually deaf individuals. After reviewing available background information, including a telephone interview with Allen's defense attorney, Dr. David Feldman conducted an interview of Allen and concluded that Allen is not competent to proceed to trial due to his lack of familiarity with the legal system and his inability to understand legal discussion with non-signing individuals. In his opinion, Allen has the capacity to understand legal concepts if they are adequately explained to him, and the demonstrated capacity to redirect his attention with prompting. Dr. David Feldman did not diagnose Allen with depression or any other kind of mental impairment. Dr. David Feldman testified that he did not administer any objective tests to Allen for two reasons. First, he and Allen were placed in separate rooms for the interview, and

that arrangement is not conducive to administering a test.  Second, he explained, there are no objective tests specifically designed for the deaf.  Hence, Dr. David Feldman's competency opinion was based only upon the interview he conducted and the materials he reviewed.  Dr. David Feldman testified that competency restoration might be useful.  He indicated that Allen has an appropriate level of ASL skills and the foundation to become educated on the legal process, but would need a teacher who could sign directly to him.  Dr. David Feldman estimated that competency training would take two or three weeks or, at most, a couple of months, rather than a long period of time.

Dr. Lisa B. Feldman, Psy.D., was called by the Government to testify at the hearing.  The Court recognized Dr. Lisa Feldman as an expert in forensic psychology.  Dr. Lisa Feldman interviewed Allen on five different dates for a total of 12 hours, which was comprised of approximately 6 hours in face-to-face meeting time and 6 hours of testing time.  Dr. Lisa Feldman reviewed all available background materials, including a psychiatric report from Dr. Delvena Thomas, D.O., M.P.H., the Chief Psychiatrist at FDC-Miami, and a report by Dr. Stephanie Hamilton, Psy.D., who assessed Allen's ability to understand disciplinary proceedings relating to his assault on a correctional staff member.[2]  Dr. Lisa Feldman administered the following objective tests:  the Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR"), the Georgia Court Competency Test-Mississippi State Hospital version ("GCCT-MSH"), the Competency Questionnaire ("CQ"), the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), the Comprehensive Test of Nonverbal

---

[2] Neither Dr. Thomas nor Dr. Hamilton rendered an opinion on Allen's legal competency to stand trial for the child pornography charges alleged in this case.

Intelligence, Second Edition ("CTONI-2"), the Multiphasic Sex Inventory ("MSI-II"), and the Validity Indicator Profile ("VIP").  She diagnosed Allen with Depressive Disorder Not Otherwise Specified, Borderline Intellectual Functioning, and Personality Disorder NOS with Antisocial and Schizotypal Features, and she noted Allen's lower level of linguistic ability.  Based upon her observations, the results of the objective tests, and the background material, Dr. Lisa Feldman concluded that none of those diagnoses interfere with Allen's ability to comprehend the proceedings or his ability to consult with counsel.  She recommended that individuals working with Allen use basic legal terminology and frequent repetitions, as well as allow extra time to redirect Allen's volitional defiance.

**D.    The Defendant Suffers from Symptoms of Depression, But Not a Personality or Psychiatric Disorder.**

       1.    The Defendant Suffers From a Depressive Disorder.

The record reflects that Allen presently suffers from symptoms of depression.  As discussed in turn below, both Dr. Brannon and Dr. Lisa Feldman diagnosed Allen with a form of Depressive Disorder, and while Dr. David Feldman did not observe diagnosable depression, he does not dispute their diagnoses.

Dr. Brannon assigned Allen a diagnosis of Major Depressive Disorder.  On examination with Dr. Brannon, Allen exhibited a depressed mood and labile affect, varying from laughing to sobbing heavily.  Dr. Brannon testified that correctional officers reported to him that at times Allen paced frantically, sobbed, was uncommunicative, and remained isolated.  During a telephone interview, Allen's brother, David Fuller, indicated to Dr. Brannon that through his pre-adult years Allen had a history of depression, sadness, and frustration, although Allen's brother

has had limited contact with Allen in recent years.  In addition, Dr. Brannon testified that Allen's unsanitary living conditions and poor hygiene indicate a lack of energy or lack of concern, which is consistent with a diagnosis of depression.  Dr. Brannon also noted that Allen was confused as to time in that he could identify the year but no further information, which confusion he testified is consistent with a mental illness.  At the hearing, Dr. Brannon admitted that he had not administered any objective tests to determine whether Allen suffers from a depressive disorder.  When asked to reconcile Dr. David Feldman's finding that Allen does not suffer from a depressive disorder, Dr. Brannon testified that depression is cyclical and that at times active symptoms may appear and at other times they may not.  Dr. Brannon suggested that the nature of his interview with Allen could have pushed Allen to be depressed or on the down-swing, whereas Allen may have felt more comfortable with Dr. David Feldman.

Dr. Lisa Feldman assigned Allen a diagnosis of Depressive Disorder Not Otherwise Specified.  She based her diagnosis on Allen's difficulty with sleeping and eating and other symptoms, such as his pre-incarceration unsanitary living conditions.  According to her report, Allen exhibited depressed mood, irritability, social isolation, and deficits in his ability to manage his daily life activities.  Dr. Lisa Feldman testified that she indicated some diagnostic uncertainty by classifying the diagnosis as "not otherwise specified" because no collateral records were available and his depressed mood could have been associated with being incarcerated.  On cross examination, however, Dr. Lisa Feldman admitted that the diagnosis of depressive disorder "not otherwise specified" is given when it is not certain if the disorder is primarily due to a general medical condition or is substance abuse induced.  She admitted that there was no evidence that Allen was taking any substances, so his depressive disorder is necessarily from a medical

8

condition.

Dr. David Feldman testified that he did not observe diagnosable depression. During his interview with Dr. David Feldman, Allen appeared cooperative and generally pleasant, and while he may have become teary-eyed a couple of times, he was not sobbing or complaining. Dr. David Feldman indicated that Allen lowered his head in response to a couple of questions, but admitted that Allen's actions were not unusual for a person facing prison time and who was feeling lonely as a deaf person while incarcerated pretrial at FDC, a hearing environment.

Notwithstanding his observations, Dr. David Feldman does not dispute the other experts' diagnoses. Dr. David Feldman testified that it is not unusual for there to be different diagnoses based upon different examinations because depression is a mood disorder. Dr. David Feldman explained that Allen might have felt more comfortable with him because he could use sign language, which could have improved Allen's mood. Dr. David Feldman testified that the differences in Allen's comfort level and mood could account for the discrepancy in the various diagnoses. Based upon the weight of the evidence, the Court finds that Allen suffers from a depressive disorder.

2.    The Defendant Does Not Appear to Suffer From a Personality or Psychiatric Disorder.

The weight of the evidence in the record reflects that Allen does not presently suffer from a personality or psychiatric disorder. While there is some evidence in the record that Allen suffers from schizophrenia, none of the three experts who conducted competency evaluations and collectively spent over ten hours with Allen concluded that Allen presently suffers from schizophrenia. Dr. Delvena Thomas, D.O., M.P.H., assigned Allen a diagnosis of schizophrenia

and indicated that Allen exhibited bizarre behavior, ranging from a lack of emotion to agitated. In addition, the record reflects that Allen was hospitalized for approximately six months during the 1980s at a Florida in-patient hospital, during which time he received a prescription for Mellaril, an antipsychotic medication commonly prescribed for schizophrenia. No other information concerning the hospitalization is available. Although the Court recognizes Dr. Thomas as well-credentialed, the Court finds that the basis for her opinion is not sufficiently concrete nor the drug prescription sufficiently recent for the Court to find that Allen presently suffers from schizophrenia.

Similarly, this Court does not find sufficient support in the record for a diagnosis of a general personality disorder. Neither Dr. Brannon nor Dr. David Feldman assigned Allen a diagnosis of a personality disorder. Dr. Lisa Feldman diagnosed Allen with Personality Disorder NOS with Antisocial and Schizotypal Features, but failed to provide a sufficient explanation for her diagnosis.[3] In particular, she alluded to factors such as impulsiveness, reckless behavior, and rationalization for his conduct without providing sufficient examples of, or explanations for, these findings. Dr. Brannon questioned her diagnosis. He indicated that it would be highly unusual for Allen to be diagnosed with both antisocial and schizotypal features, because schizotypal implies discomfort around others while antisocial implies manipulation of others,

---

[3] Dr. Lisa Feldman administered the Minnesota Multiphasic Personality Inventory-2 test to assesses mental illness. However, the results of the test are invalid and thus were not factored into her evaluation. She explained that while some of the test results indicated that Allen understood what he was reading and responded in a specific manner, another set of indicators, which assesses exaggeration of psychological problems, was elevated and rendered the test results invalid. Dr. Lisa Feldman qualified that she did not assign Allen a classification of malingering since she did not think the test accurately reflected malingering, but the test results are nevertheless invalid.

which would be an unusual combination. Moreover, there is other evidence in the record, such as Allen's reactions during the execution of the search warrant, that is not consistent with an individual who rationalizes his behavior and perceives it to be appropriate. Based upon the weight of the evidence, this Court does not find that Allen suffers from a general personality disorder.

**E.      The Defendant Does Not Appear to Have Any Significant Deficits in the Area of Intellectual Functioning.**

Although his intelligence is below average, Allen does not appear to have any significant intellectual deficits. All three experts that rendered competency opinions in this case found that Allen does not present any signs of mental retardation or any other deficit in intellectual functioning that would interfere with his competency to stand trial.

Dr. Lisa Feldman administered the Comprehensive Test of Nonverbal Intelligence, Second Edition, which assesses nonverbal intelligence. The CTONI-2 test is administered through the use of pictures on an easel without the use of words. She testified that the test was appropriate for Allen because the test does not require language, it allows for ASL interpretation, and there are instructions for deaf individuals whereby she used pantomime instruction. Allen scored in the upper range of borderline intellectual functioning. Based upon those results, Dr. Lisa Feldman concluded that Allen did not have any significant intellectual deficits or problems that would interfere with his competency.

Neither of the other two experts who completed competency evaluations found that Allen suffers from any significant deficits in intellectual functioning. Dr. Brannon testified that he did not observe any signs of mental retardation and thus did not administer any tests to assess

11

intellectual functioning.  Dr. David Feldman likewise testified that he did not view intellectual

functioning testing as necessary.  Dr. David Feldman testified that Allen does not appear

mentally challenged and that he is able to understand everyday concepts.  Dr. David Feldman

opined that Allen has the capacity to understand concepts that are explained to him.

**F.      The Defendant Suffers from Certain Linguistic Difficulties Associated with his Deafness.**

The record establishes that Allen has difficulty understanding complex legal concepts

because many legal terms in the English language do not have a direct translation in ASL.[4]  Dr.

David Feldman and Dr. Brannon testified that Allen suffers from linguistic difficulties,

sometimes referred to as "linguistic incompetence."  Dr. David Feldman explained that the idea

behind linguistic incompetence is not that the deaf person does not have language.  A deaf person

can be considered linguistically incompetent and still have a good understanding of ASL.

Rather, because of the difficulties in translating legal terms from the English language to ASL, a

deaf person may not have the background and familiarity with the legal terms and concepts to be

competent to stand trial.

When an ASL interpreter must interpret legal terms for which there are no corresponding

ASL signs, the interpreter has two options.  The interpreter may either fingerspell the terms or

provide explanations and examples of them.  Fingerspelling may not be not effective if the deaf

individual does not know or understand the underlying legal terms, and providing explanations

---

[4]  The Court's finding with respect to Allen's linguistic difficulties is limited.  The Court is not making a conclusion here on the legal issue of whether Allen's linguistic difficulties render him incompetent to stand trial.  Rather, the Court's factual finding is merely an acknowledgment that Allen does have difficulty understanding legal vernacular due to the problems in translating English legal terms into ASL.

and examples is time-consuming.

In Dr. David Feldman's opinion, Allen is linguistically incompetent because he does not have any familiarity with legal proceedings and has never been taught the meaning of legal concepts in an understandable way. He indicated that Allen's linguistic competency in other areas of his life, such as his use of a personal computer, is not relevant to his linguistic incompetence with respect to these proceedings because the language in the two areas is different. Significantly, however, Dr. David Feldman also opined that Allen has the capacity to understand legal terms if they are adequately explained to him.

Dr. Lisa Feldman testified that Allen does not suffer from linguistic incompetence, but recognized in her report that Allen suffers from a lower level of linguistic ability. She testified that based upon her review of the transcripts of Allen's online chats, Allen can carry on many different types of conversations with very purposeful, deliberate language. He can make travel plans, discuss grocery store shopping, and replenish his prepaid phone card minutes. She reported that Allen's understanding of the English language appears higher than his documented background and education.

Despite Allen's demonstrated ability to communicate with others pertaining to non-legal matters, this Court finds that Allen has exhibited some difficulty in understanding legal terms. *See infra* Section H. The Court credits the testimony of Dr. David Feldman, who has specialized experience with the deaf population, that Allen's difficulty in understanding legal terms relates to the fact that many legal terms in the English language do not have a direct translation in ASL, coupled with Allen's unfamiliarity with legal proceedings.

**G.     Defendant's Performance on Legal Competency Tests**

13

The medical experts administered a number of standardized tests to assess Allen's competency. Whereas he performed well on tests that were easy to understand–the CAST-MR, the GCCT-MSH, and the Competency Questionnaire, Allen showed significant impairment on parts of the MacArthur test, which is generally considered a more difficult test to comprehend and involves more language, as further discussed below.

     1.     MacArthur Test

According to the results of the MacArthur Competence Assessment Tool–Criminal Adjudication administered by Dr. Brannon, Allen's abilities to reason and to appreciate his circumstances are significantly impaired. The MacArthur test is a structured interview used to assess legal competency. It is the most researched and widely used test for determining legal competency, according to Dr. Brannon. There are three parts to the MacArthur test: an Understand domain, which evaluates factual knowledge and understanding of a legal proceeding; a Reasoning domain, which evaluates an individual's ability to assist counsel; and an Appreciation domain, which compares situations and asks the individual whether he or she would be treated the same or differently than others. Each domain is comprised of a series of standardized questions. For the majority of the questions, the defendant is read a hypothetical assault-related case and asked specific questions about it. To administer the test to Allen, Dr. Brannon used the assistance of a sign language interpreter.

On the Understand domain, Allen scored 11 out of 16, which is an acceptable score. On the Reasoning domain, Allen scored 7 out of 16, which is in the Significant Impairment range or two standard deviations below average. On the Appreciation domain, Allen scored 4 out of 12, which is in the Significant Impairment range and represents three standard deviations below

average.  Dr. Brannon indicated that these results show that Allen may have an ability to understand and give facts, but does not have an ability to appreciate and apply the facts or the ability to compare his circumstances to others.  With regard to the scoring process, Dr. Brannon testified that the MacArthur test is standardized and that the results are determined according to a standardized manual, although there is evidence in the record that some amount of subjectivity goes into the scoring process.

Attacking the appropriateness of the MacArthur test in this case, Dr. Lisa Feldman testified that the test is too difficult for Allen.  She explained that the MacArthur test contains extensive verbal instructions that would be difficult to translate in a manner that Allen would be able to understand.  In addition, she explained that even defendants who have no deficits in cognitive functioning or comprehension have a hard time understanding the hypothetical factual scenario that is posed to them as part of the MacArthur test.  On cross-examination, Dr. Brannon admitted that some of the questions that are asked as part of the MacArthur test involve a complicated factual scenario.  In his view, however, the hypothetical scenario presented in the MacArthur test is no more complicated than what goes on in the courtroom.  Further, Dr. Brannon testified, the results of the MacArthur test as applied to this case are reliable because Allen was able to give good answers to the questions in the Understand domain, which relies upon the same basic factual scenario that is used for the Reasoning domain.

Apart from the difficulty of the MacArthur test, all of the experts, including Dr. Brannon, agree that the test is not designed for deaf individuals and that the manual for the MacArthur test indicates that it should not be translated.  Dr. Brannon testified that he conducted the MacArthur test because the deaf is a specialized population, so he wanted to administer a second interview

in addition to his regular interview. He testified that the manual probably refers to translation into a spoken language, but acknowledged that any time a standardized test is translated into ASL there may be a translation problem. Likewise, Dr. David Feldman opined that any time a standardized test is translated into ASL, there is concern about the validity of the results. More specifically, Dr. David Feldman testified that ASL is a foreign language, and that if the MacArthur manual indicates that the test should not be translated into a foreign language, he would have concerns about its administration to a deaf individual using ASL. Similarly, Dr. Lisa Feldman questioned the validity of the MacArthur test results due to the use of a sign language interpreter, especially given the extensive instructions for that test.

2.      CAST-MR

On the Competence Assessment for Standing Trial for Defendants with Mental Retardation administered by Dr. Lisa Feldman, Allen obtained an overall score of eighty percent, indicating that he has an acceptable ability to comprehend basic legal concepts, assist his counsel, and understand the facts and events of his case.

The CAST-MR test contains two multiple choice sections and a section with more comprehensive questions pertaining to the defendant's case. Specifically, there is a multiple-choice section that assesses the defendant's knowledge of basic legal concepts; a multiple-choice section regarding skills to assist defense counsel; and a section containing case-specific questions. For example, one multiple-choice question on the CAST-MR asks the defendant about the role of the jury and then gives three fairly simple answers.

Dr. Lisa Feldman administered the test by asking Allen questions through the use of an interpreter, and Allen was also able to read the questions as they were being asked. She testified

16

that the average readability level of the multiple-choice questions is a grade four or less.

On the section regarding basic legal concepts, Allen obtained 20 out of 25, or 80 percent. On the section regarding skills to assist counsel, Allen obtained 11 out of 15, or 73 percent. On the section regarding understanding case-specific events, Allen scored 9 out of 10, or 90 percent. Allen's total score on the CAST-MR was 40 out of 50, or 80 percent. These scores fall within the range of scores obtained by individuals with mental retardation but found or presumed to be competent and individuals with no mental retardation. Based upon Allen's performance on the CAST-MR, Dr. Lisa Feldman concluded that Allen demonstrated adequate knowledge of the criminal justice system, an understanding of the attorney-client relationship, an ability to discuss the facts in the case in a coherent manner, and an understanding of the relationship between the facts and the subsequent charges.

Dr. Brannon testified that the legal competency test administered by Dr. Lisa Feldman, the CAST-MR, is a test designed for mentally retarded individuals and is not appropriate for individuals who are not mentally retarded. Dr. Brannon testified that the CAST-MR is a simplified version of the MacArthur test. Likewise, Dr. David Feldman testified that the CAST-MR is intended for mentally retarded individuals, although he admitted on rebuttal cross-examination that the manual for the CAST-MR does not expressly prohibit administration of the test to individuals who are not mentally retarded. In response, Dr. Lisa Feldman agreed that the CAST-MR contains very easy-to-read, easy-to-understand language. She testified that the CAST-MR contains "vocabulary and syntax that are appropriate for persons having lower levels of linguistic ability." (Gov.'s Ex. 13, Dr. Lisa Feldman's Forensic Evaluation at 17.) In her view, the fact that the test is given to an individual with a higher level of functioning would not

invalidate the test results.

As with the other tests, Dr. David Feldman testified that the CAST-MR is not designed for the deaf population.  Dr. David Feldman testified that studies show that multiple-choice tests are not appropriate for deaf individuals because they generally require a level of understanding of the English language and grammar rules that a deaf individual does not possess.

3.      GCCT-MSH

On the Georgia Court Competency Test-Mississippi State Hospital version administered by Dr. Lisa Feldman, Allen scored sixty-nine percent, which is in the range of scores of individuals found competent.

The GCCT-MSH is a series of fairly simple questions asking the defendant about the participants in a courtroom proceeding, the charges against the defendant, and the range of consequences that the defendant is facing, as well as the defendant's relationship with his attorney.  The first set of questions, reflecting approximately one-third of the test, requires the defendant to visually identify the participants in a picture of a courtroom.  Then, the test poses such questions as about the functions of the participants, the charges, and the range of consequences.  Finally, the test is followed by a screening measure for atypical responses.  Dr. Lisa Feldman administered the test by reading the test to Allen through the use of an interpreter and asking him specific questions.  Allen responded through the use of an interpreter.

Allen scored sixty-nine percent on the test, which is in the range of scores of individuals found competent.  She testified that Allen was able to understand the role of courtroom personnel, including his defense attorney, and the possible range of penalties.  In addition, he scored one on the scale pertaining to atypical presentation, indicating he was not feigning.

18

Dr. Brannon testified that the GCCT-MSH, which was administered by Dr. Lisa Feldman, is not highly effective because it is extremely easy and heavily focuses on factual information, not reasoning or appreciation skills. For example, the entire first set of questions requires the defendant only to visually identify the participants in a picture of a courtroom. Yet, Dr. Brannon admitted that the GCCT-MSH is a more difficult test than the CAST-MR.

In addition, Dr. David Feldman questioned Dr. Lisa Feldman's use of the GCCT-MSH because there are no tests addressing the validity of the test on the deaf population. On cross-examination, Dr. David Feldman admitted that he has administered the GCCT-MSH to deaf individuals, but opined that the test is appropriate for a deaf individual only if the person administering the test knows sign language to a fluent degree.

4.    CQ

Dr. Lisa Feldman testified that she administered a 15-item competency questionnaire. She testified that she used an interpreter to translate the questions to Allen and then translate his responses to her. One example of a question is "I am charged with a crime. A. True. B. False." Allen obtained a score of 11 correct items out of 15. On cross examination, Dr. Lisa Feldman admitted that she had not read any research validating the use of the competency questionnaire for a deaf defendant.

5.    Effort Testing

a.    Dot Counting Test

Dr. Brannon administered the Dot Counting Test to evaluate the adequacy of Allen's effort. Allen scored a perfect score on the Dot Counting Test, an extremely easy test, which requires the test taker to count the dots on twelve cards. Based upon Allen's test score, Dr.

19

Brannon concluded that there was no evidence that Allen was exaggerating his deficiencies during the MacArthur test.

b.   VIP Test

Dr. Lisa Feldman administered the Validity Indicator Profile test to Allen to test his effort level on cognitive tasks.  She testified that the interpreter interpreted the instructions and then Allen completed the test on his own.  She chose the VIP test because the first part is nonverbal, requiring the defendant to respond "yes" or "no" to various patterns on a page.  The second part of the test requires the defendant to read English.  Dr. Lisa Feldman testified that on the nonverbal part of the test, Allen's performance showed a compliant response style, indicating that he gave a good effort.  On the verbal portion, Allen showed an inconsistent pattern of responding, which did not tell Dr. Lisa Feldman too much information.

Dr. Brannon opined that the VIP test administered by Dr. Lisa Feldman to assess effort is not as effective as the DOT test because the VIP test has both verbal and nonverbal portions and Allen may have had difficulty with the verbal/language portion.  Likewise, Dr. David Feldman opined that he has questions about Dr. Lisa Feldman's administration of the verbal portion of the VIP test, and testified that the VIP test has not been normed on deaf individuals.  Nevertheless, none of the experts who performed competency evaluations concluded that Allen was feigning his deficiencies.

6.   Summary of Defendant's Performance on the Legal Competency Tests

Based upon the results of the four competency tests administered by Dr. Michael Brannon and Dr. Lisa Feldman–the MacArthur test, the CAST-MR, the GCCT-MSH, and the CQ, the experts agree that Allen has a sufficient knowledge and understanding of factual information

pertaining to legal proceedings, such as the roles of the primary actors in the courtroom. Dr. Brannon and Dr. Lisa Feldman appear to disagree, however, as to whether Allen has a rational understanding of the proceedings, and the ability to assist counsel with his defense and appreciate his specific case.

None of the tests administered by the experts to Allen are designed for the deaf population, and neither Dr. Brannon nor Dr. Lisa Feldman know sign language. Further, there is considerable disagreement among the experts as to which test or set of tests is most appropriate for Allen. The factual scenario presented as part of the MacArthur test administered by Dr. Brannon is rather complicated for a person who is linguistically-impaired in the area of legal proceedings. Based upon the Court's own review of the questions on the MacArthur test, it is also apparent that the questions posed as part of the Reasoning and Appreciation domains are also quite complicated and involve a significant amount of language. The three tests administered by Dr. Lisa Feldman, on the other hand, are relatively easy but do not assess Allen's reasoning and appreciations skills as rigorously as the MacArthur test does. In particular, the GCCT-MSH and CQ heavily focus on factual information. The CAST-MR, which is a simplified version of the MacArthur test, is more comprehensive in focus and is appropriate for persons with lower levels of linguistic ability but was designed for a population of which Allen is not a part.

According to the testimony of Dr. David Feldman, who has particularized experience with the deaf population, none of the four tests stand out as an appropriate measure of competency under the circumstances of this case. None of these tests have been normed on the deaf population. For that reason Dr. David Feldman testified that he did not administer any kind

of test to determine Allen's competency, but rather relied upon his own subjective interview and materials. He stated that he did not know of any competency tests available for the deaf population, although there are some tests that can be given by a deaf professional. Dr. David Feldman opined that any time a standardized test is translated into ASL, there is concern about the validity of the results.

## H.    Defendant's Legal-Related Knowledge and Understanding

Below is a summary of Allen's legal knowledge, as reflected in Allen's answers to the objective tests discussed above and the clinical interviews conducted by Dr. Brannon and Dr. David Feldman.

### 1.    Knowledge Relating to the Charges and the Possible Penalties

All of the examining experts agree that Allen is able to identify the charges against him. As to the consequences, the experts generally agree that Allen either understands the possible consequences facing him or has the capacity to understand them if adequately explained to him. Specifically, Dr. Brannon testified that Allen is able to identify the range of penalties facing him within the context of this criminal case. Dr. David Feldman testified that Allen understands that going to jail is a possible consequence of the charges against him, and that while he does not appear to know how long he could remain in prison, Allen would probably be able to understand the concept if someone were to explain the range of sentencing in an understandable way. Dr. David Feldman was concerned, however, by the fact that Allen thinks "going home" is a possible consequence. Dr. Lisa Feldman testified that based upon his responses on the GCCT-MSH, Allen understands the possible range of penalties, although on cross-examination she admitted that as part of the CAST-MR, Allen did not answer the question relating to the penalties he was

facing but proceeded to give an account of his actions.

2.    Knowledge of the Participants in the Courtroom and Trial Procedure

All of the examining experts agree that Allen can identify the participants in a courtroom proceeding, although there is some disagreement regarding the extent of Allen's understanding of their functions and trial procedure in general. Dr. Lisa Feldman testified that Allen understands the roles of the various courtroom personnel. Likewise, Dr. Brannon testified that Allen understands the roles of the people involved, although he has difficulty understanding how the various people work together during a trial. Dr. Brannon testified that Allen knows the "pieces" but not how the pieces fit together. Dr. David Feldman initially testified that Allen is able to identify the players in the courtroom, but not what they do beyond basic identifications. On cross-examination, however, Dr. David Feldman clarified that Allen does understand the roles of the judge, prosecutor, defense attorney, witnesses, and jury. He explained that when Allen indicated confusion on some of the terms, he finger-spelled the terms and then Allen understood.

3.    Knowledge of Legal Terms

According to the testimony of Dr. Brannon and Dr. David Feldman, Allen has considerable difficulty understanding legal terms and concepts due to translation problems. Dr. Brannon testified that Allen has difficulty understanding the definition of "no contest" and the idea of the confidentiality of attorney-client communications. In addition, Allen has difficulty understanding certain words such as "evidence," "appeal," and "rights" despite considerable coaching. Allen also has difficulty understanding the concept of a plea offer. Allen could repeat words but could not put the meaning of the terms in his own words.

Likewise, Dr. David Feldman testified that Allen does not seem to recognize the terms

"evidence," "appeal," and "rights," despite his attempt to use ASL, finger-spelling, and extensive

gestures.  Allen could restate the definitions to Dr. David Feldman but could not apply the terms

to his situation.  In addition, Allen is easily confused about the concept of a "plea bargain" and

his plea options.  Dr. David Feldman again explained that these terms do not have a direct

translation into ASL.  Further, Dr. David Feldman testified that Allen's defense counsel has met

with Allen a number of times and that defense counsel has been unable to communicate with

Allen.  Dr. Feldman opined that Allen has not been exposed to legal terms through ASL, and that

he would need to be taught these concepts in ASL such as through competency restoration

training.

On cross examination, Dr. David Feldman admitted that he did not attempt to explain the

meaning of the terms in any depth.  For example, when Allen did not understand sign language

for the word "rights," Dr. David Feldman explained generally that the law permits you to do

certain things, but did not provide examples of his rights or explain that he did not have to waive

those rights.  Dr. David Feldman agreed that if someone were to explain to Allen the concepts of

"evidence," "appeal", and "rights," Allen could probably understand the concepts.  Dr. David

Feldman further agreed that if someone were to explain these concepts to Allen in a way that he

could understand, he could assist his counsel.  Dr. David Feldman testified that Allen does not

have a cognitive problem with understanding concepts; rather, his lack of competency arises

from the fact that these concepts have not been explained to him in a way that he can understand.

On redirect, Dr. David Feldman opined that competency training would help Allen understand

these concepts.

      4.     Knowledge Relating to Defense Counsel

Dr. David Feldman testified that Allen does not appear to understand the impact his attorney could have on his case. Allen only understands that his defense attorney would provide him "support." When Dr. David Feldman asked Allen to explain the ways his attorney would support him, Allen was not able to elaborate. In addition, Allen expressed frustration to Dr. David Feldman and other examiners that his defense attorney had not gotten him released from jail yet; Allen believes his attorney should have accomplished this by now. Also, according to the examiners, Allen does not appear to understand the confidentiality of attorney-client communications. On cross examination, however, Dr. David Feldman admitted that he did not attempt to teach Allen about his attorney's responsibilities, but rather only assessed the amount of information Allen already has.

5.      Knowledge of the Evidence against Him

Dr. David Feldman also indicated that Allen does not appear to understand the evidence in his case. Dr. David Feldman told Allen that the government had found child pornography pictures on his computer, but Allen insisted that he had deleted all of his picture and movie files so there was no evidence that the government could seize. Dr. David Feldman indicated that Allen does not appear to understand that the government seized evidence against him. However, on cross-examination, Dr. David Feldman admitted that Allen might not understand that deleted files can still be retrieved by a forensic examiner.

I.      **Behavioral Observations**

1.      Behavior in Prison

Allen's behavior in prison has been variable. At times, the prison's correctional officers have observed Allen interacting with others, sleeping, and eating, as is typical of other inmates.

At other times, Allen has remained isolated in his cell with covers over his head. Yet at other times, the correctional officers have observed Allen pacing frantically, sobbing and crying, and being generally uncommunicative.

   2.      Behavior During Examination

During examination, Allen's behavior was variable. While at times he was uncooperative, Allen demonstrated an ability to exhibit cooperative behavior in situations where the examiner took the time to redirect his behavior and where he felt comfortable with the examiner, as more fully discussed below.

Dr. Brannon testified that Allen appeared responsive at times and at other times easily irritated and emotional. At times, Allen placed his head on the table, sobbed, complained of hunger and boredom, and stated he wanted to "get out of here." Dr. Brannon observed that Allen became easily irritated and disinterested, exhibiting a short attention span. In addition, Allen sometimes appeared hyperactive and became upset upon hearing something he did not like. At other times, Allen responded to Dr. Brannon's questions without emotion or frustration.

Allen exhibited the ability to control his behavior with sufficient prompting by the examiner. For example, during his interview with Dr. Lisa Feldman, Allen was initially resistant to participating in the interviews and testing. At times, Allen was uncooperative and would turn himself away from Dr. Lisa Feldman and the interpreter, preventing any interpretation from taking place. However, after prompting by Dr. Lisa Feldman, Allen eventually complied and participated in the interview. In particular, at his second meeting with Dr. Lisa Feldman, Allen initially indicated he did not want to participate in the testing, but after prompting, eventually agreed to participate and even apologized for his resistant behavior during the first meeting.

26

Likewise, Allen exhibited cooperative behavior in situations where the examiner could communicate with him using ASL. That is, during his interview with Dr. David Feldman, Allen became open and cooperative after the examiner began using sign language to communicate with him. At the beginning of the interview, Allen exhibited anger associated with the apparent fact that his handcuffs had pinched his wrist. Allen moved toward the door indicating a desire to exit the interview. However, after Dr. David Feldman began signing to him, Allen appeared interested in the interview and his anger subsided. During the rest of the interview, Allen appeared open and cooperative. When asked about Allen's failure to cooperate at times with the other examiners, Dr. David Feldman attributed Allen's cooperative behavior with him to his own use of sign language, which likely made Allen feel more comfortable.

     3.     Behavior with Defense Counsel

Allen has had a difficult time communicating with his defense attorney about legal concepts. The defense counsel relayed those difficulties to Dr. David Feldman, and Dr. Brannon had the opportunity to observe Allen interact with defense counsel.

During Allen's interactions with defense counsel in Dr. Brannon's presence, Allen was initially cooperative, particularly when the subject of the discussion was not legal-related. However, when defense counsel began to discuss legal issues, Allen became agitated, lost focus, and eventually stopped watching the sign language interpreter. Allen even asked to terminate the interview and at some points hit the table. Except for competency restoration training and medication for his mood disorder, Dr. Brannon did not have any suggestions for any modifications that would enable Allen to be able to communicate with his attorney.

     4.     Behavior in Court

During the two-day competency hearing, which lasted approximately thirteen hours, Allen focused his attention on the courtroom interpreter's translation throughout the proceedings. He was not disruptive and, significantly, never once interrupted the hearing to communicate his inability to comprehend the legal proceeding.

Allen appeared to be able to follow the interpreter's translation. At times, Allen's facial expressions and mannerisms communicated agreement with what was being said at the hearing. Generally speaking, however, Allen appeared unaffected by the proceedings. He remained calm and did not manifest an inability to understand the proceedings. In addition, he exhibited a long attention span and good concentration skills.

Dr. Brannon speculated that Allen would become too emotional to get through a cross-examination. Dr. Brannon testified that he did not think that the mere use of basic legal terms and repetition would render Allen competent because of his tendency to get upset when confronted with information he did not like to hear. Yet, at the competency hearing, Allen appeared calm and undisturbed by potentially harmful testimony.

**J.      Defendant's Thought-Processes and Reading Level**

1.      Thought-Processes

Based upon the weight of the evidence, the Court finds that Allen generally has organized thought-processes, which become tangential only at times, and as to those isolated times, he has the demonstrated ability to respond to prompting and redirect this thought-processes.

Dr. Brannon testified that Allen's thought-processes is oftentimes disorganized. During examination, Allen gave contradictory, rambling, disorderly, and unrelated responses to examination questions. Allen also had a difficult time distinguishing between relevant and

irrelevant details and became easily sidetracked. Dr. Brannon opined that Allen's disorganized thought-processes would be problematic for his testifying relevantly and communicating with his attorney.

Dr. David Feldman initially testified that Allen was too confused to testify relevantly, but on cross-examination, admitted that Allen was generally able to answer questions in a logical and consistent manner, and during the times that he started discussing irrelevant matters, Dr. David Feldman was able to redirect Allen to the topic at hand.

Likewise, Dr. Lisa Feldman reported that Allen generally exhibited "organized, rational, sequential, and coherent thought processes." (Gov.'s Ex. 13, Dr. Lisa Feldman's Forensic Evaluation at 11.) She reported that he demonstrated adequate concentration skills and did not display any confusion. Nevertheless, she recommended that individuals working with Allen allow extra time to redirect his volitional defiance.

Finally, the two others doctors opined that Allen generally has organized thought-processes, which become tangential only at times. Dr. Thomas reported that Allen exhibited linear, yet circumstantial thought processes at time. (Id. at 12.) Dr. Hamilton also reported that Allen exhibited "organized and goal-directed thought-processes; yet became tangential, at times." (Id. at 10.)

2.    Reading Level

The weight of the evidence suggests that Allen reads at approximately a fourth- to sixth-grade reading level, although there is a fair amount of uncertainty as to Allen's reading level because he was not administered a reading test by any of the examiners. Dr. Brannon was understandably hesitant to estimate Allen's reading level without administering a reading test.

As more fully discussed below, Dr. David Feldman opined that Allen's reading level is probably somewhere between the fourth and sixth grades, and Dr. Lisa Feldman indicated that Allen's understanding of the English language appears to be on a higher level than reflected in his educational history.

Initially, Dr. David Feldman opined that Allen reads on a fourth-grade reading level. On cross examination, however, he indicated that his reading level is somewhere between the fourth and sixth grades. His opinion is based upon the interview he conducted with Allen and the research he has read on deaf people's typical reading levels as compared to hearing people's reading levels in the same grade in school. He also commented that in the 1980s, the quality of education at deaf schools was not very good. With regard to the transcripts of Allen's online communications, Dr. David Feldman testified that while Allen may know some English, his writing skills are not particularly strong. Allen's online profile also contains simple English. Dr. David Feldman testified that nothing in the government's evidence changed his opinion on Allen's reading level. Further, Dr. David Feldman testified that Allen's ability to read and write basic English language, as evidenced by his online chats, does not in any way correlate to his ability to understand complex legal concepts.

Dr. Lisa Feldman testified based upon her review of the transcripts of Allen's online chats and the files that were found on his hard drive, Allen communicated in a very coherent manner. According to Dr. Lisa Feldman, there did not appear to be any type of English language barrier that precluded him from getting his message across to the sender or understanding any message he received.

**K.    Defendant's Computer-Related Knowledge and Abilities**

The evidence presented at the hearing demonstrates that Allen possesses the ability to use a personal computer, navigate his way through a file-sharing network, reformat his computer, and use a webcam. The experts disagree as to whether Allen's computer-related knowledge and abilities are relevant to the issue of legal competency.

1.    Computer-Related Knowledge and Abilities

Detective Charles Ramos testified that Allen is a user on GigaTribe and sent him an invitation on GigaTribe to join Allen's file-sharing network  According to Detective Ramos, in order to sign-up and use GigaTribe, a user must follow the following steps: (1) download the program on the GigaTribe website; (2) supply GigaTribe with an e-mail address; and (3) hit the hyper-link on the e-mail response to activate the account. There are detailed instructions on the website as to how to download the program. Detective Ramos further testified that Allen has a public profile on GigaTribe and is an "ultimate" user on GigaTribe, which requires payment using a credit or debit card.

Detective Ramos testified that he accepted Allen's invitation to join, which allowed him to view the folders that Allen made available for others to see. For a user, such as Allen, to add folders to a GigaTribe account, the user must do the following: (1) click "add folders"; (2) locate on the user's computer the drive where the folders are, such as the C drive; and (3) pick the folders that the user wants to add. The website contains instructions on how to share folders.

Detective Ramos testified that Allen made four or five folders available for him to view, and one of the folders was password-protected. He testified that the user can password-protect a folder by highlighting the folder, right-clicking on the folder, and modifying access by putting a password on the folder. He testified that the GigaTribe website has instructions on how to

31

password-protect a folder.  He testified that the folder that was password-protected contained the illegal contraband.  In addition, Detective Ramos testified that the password-protected folder contained subfolders, which indicates Allen put some effort and time into categorizing the folders.

Detective Ramos testified that he and Allen engaged in several real-time chats on GigaTribe.  He indicated that Allen had the ability to communicate back and forth with him in that he responded appropriately to the questions asked of him.

Detective Ramos testified that Allen communicated through a webcam with Detective Ramos.  Detective Ramos testified that to set-up a webcam, a person must either have a webcam on the computer or install one, using an installation disc; then, the person must set up an account through Skype, Yahoo, etc., to communicate through the webcam.  Detective Ramos testified that Allen communicated on webcam through a Yahoo account.  Dr. Lisa Feldman testified that she saw the video of Allen conversing with Detective Ramos through the use the webcam and that he was able to converse in a logical and purposeful manner.

Detective Ramos testified that before the search warrant was executed in this case, Allen reformatted his computer, meaning he deleted the whole machine and restored it.  Allen deleted everything on the hard drive and set up a new operating system using an installation disc.  In Detective Ramos's opinion, reformatting a computer takes some degree of computer knowledge.

On cross examination, Detective Ramos admitted that he did not know whether Allen set up his GigaTribe account and its features on his own or whether someone assisted him. However, Detective Ramos testified that Allen told a special agent that he reformatted the computer himself.  In addition, Detective Ramos testified that Allen told him during their online

communications that he had been using a personal computer for twenty years and that he could make a video movie. Detective Ramos also testified that Allen sent him a hyper-link during their communications, which indicated to the detective that Allen had some computer knowledge.

2.      Relevance to Competency

Dr. Brannon testified that he did not find Allen's computer-related knowledge and abilities to be relevant to the issue of competency. He explained that Allen's ability to understand computer-related terms is not relevant to his ability to comprehend legal terminology. He also indicated that he may have been told factual information regarding file sharing programs that he then repeated to others, but that factual knowledge does not shed any light on his reasoning skills. In addition, he stated that it is possible for a person with a mental illness to be organized and have great or average abilities in one area, here, computers, but be deficient in others, such as legal competency and personal hygiene.

Likewise, Dr. David Feldman testified that the police reports and transcripts of Allen's online communications on Gigatribe and Yahoo did not affect his competency evaluation. He reasoned that Allen was not discussing legal terms in his online communications. Dr. David Feldman testified that Allen did admit to downloading pictures containing child pornography and using GigaTribe because its servers are overseas. However, David Feldman testified that there is no correlation between a person's ability to use a computer and his competence to stand trial.

Dr. Lisa Feldman testified that in making her competency determination, she considered the communications that Allen had with Detective Ramos and other computer users, including the language used and the webcam communication. Dr. Lisa Feldman testified that during his online communications, Allen discussed such topics as the least expensive mode of

33

transportation to get to a destination, including an Amtrak train, a Greyhound bus, and air travel. Allen also discussed sending a money order to the undercover detective and replenishing his prepaid phone card. Dr. Lisa Feldman opined that based on the online communications she reviewed, Allen communicated in a coherent manner.

## CONCLUSIONS OF LAW

The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the government from convicting or sentencing a defendant who is incompetent. *See* U.S. Const. Amend. V; *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The legal test for competency is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *United States v. Rahim*, 431 F.3d 753, 760 (11th Cir. 2005) (citation and internal quotation marks omitted). The standard for competency is also statutorily prescribed. A person is incompetent to stand trial if "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The preponderance of the evidence standard applies. *Id.* The preponderance of the evidence standard requires the factfinder to find "that the existence of [the] fact is more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970).

In making a competency determination, the Court may consider a number of factors, including the defendant's behavior in the courtroom, evidence of irrational behavior, and any prior medical opinions as to competence. *See Drope v. Missouri*, 420 U.S. 162, 180 (1975).

34

Similarly, the Eleventh Circuit has permitted the Court to consider a defendant's behavior and statements in open court, letters drafted by the defendant, and previous psychological evaluations. *See Rahim*, 431 F.3d at 759; *Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir. 1996) (providing that information relevant to the determination of whether to order a competency hearing may include "evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion"). Furthermore, evidence of incompetency need not be in the form of admissible evidence. *See Rahim*, 431 F.3d at 759.

While the Court may consider expert testimony in determining competency, the Court is free to assign whatever weight the Court determines is due to such testimony. *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) (affirming the district court's decision finding the defendant competent because the Government's experts were determined to be more persuasive). When "faced with 'diametrically opposite expert testimony,' a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Id.* (quoting *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998)). For example, in *Battle*, the Eleventh Circuit found no error in a district court's decision to find the government's witnesses–who had evaluated the defendant over a longer and more consistent period of time–more persuasive. 419 F.3d at 1299; *see also United States v. Frank*, 956 F.2d 872, 876 (11th Cir. 1991) (affirming the district court's decision to reject the testimony of the defense experts and give greater weight to the Government's experts).

**I.     This Court Need Not Definitively Determine Which Party Bears the Burden of Proof Because the Evidence is Not in Equipoise.**

Neither the United States Supreme Court nor the Eleventh Circuit has squarely addressed

the issue of which party bears the burden of proof as to competency. In *Cooper v. Oklahoma*, 517 U.S. 348, 361-62 (1996), the Supreme Court indicated that the burden of establishing incompetence rests with the defendant, but that indication was merely dictum. In *United States v. Makris*, 535 F.2d 899, 906 (5th Cir. 1976),[5] our predecessor court stated the government has the burden of proving the defendant competent, but that too was dictum, and the Eleventh Circuit has since distinguished *Makris* on grounds that a different competency statute was at issue and that the government, not the defendant, raised the issue of competency. *United States v. Izquierdo*, 448 F.3d 1269, 1277-78 (11th Cir. 2006). Finally and most recently, in *Izquierdo*, the Eleventh Circuit held that the defendant has the burden of proving incompetence as to a defense motion to withdraw a guilty plea and commented more generally that the current competency statute, 18 U.S.C. § 4241, "arguably contemplates that the burden will lie with the party making a motion to determine competency," but expressly narrowed its holding to the particular facts of that case. 448 F.3d at 1276-78.

The other circuits are split on which party bears the burden as to incompetency. The Third, Fifth and Ninth Circuits place the burden of proof on the government to prove competence. *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991); *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989); *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987). The Fourth and Tenth Circuits place the burden of proof on the defendant to prove incompetence. *See United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005); *United States v. Smith*, 521 F.2d 374, 377 (10th Cir. 1975). The Eighth Circuit's most recent precedent

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit that were rendered prior to October 1, 1981.

places the burden on the defendant to prove incompetence, *United States v. Denton*, 434 F.3d 1104, 1112 (8th Cir. 2006) (stating "[t]he burden rests with the defendant to demonstrate that he was not competent to stand trial"); *United States v. Jimenez-Villasenor*, 270 F.3d 554, 559 (8th Cir. 2001) (declaring "the burden of persuasion rests with [the defendant] to show that he was incompetent to stand trial by a preponderance of the evidence"), but the circuit has appeared hesitant to decide the issue with any finality, *United States v. Whittington*, 586 F.3d 613, 618 (8th Cir. 2009) ("The guidance of the Supreme Court, and the recent precedent of this circuit, support the government's position that the burden is on the defendant to prove incompetence by a preponderance of the evidence. We need not address the burden of proof issue further because we conclude the district court's finding of competency in this case did not depend upon the allocation of the burden of proof." (internal citations omitted)). The Seventh Circuit has issued inconsistent opinions on the placement of the burden of proof. *See United States v. Morgano*, 39 F.3d 1358, 1373 (7th Cir. 1994) ("[A] criminal defendant is presumed to be competent to stand trial and bears the burden of proving otherwise."); *United States v. Teague*, 956 F.2d 1427, 1431 n.10 (7th Cir. 1992) ("[O]nce the issue of the defendant's mental competency is raised, the government bears the burden of proving that the defendant is competent to stand trial."). The Second Circuit has declined to reach the issue, noting "'[t]he allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent.'" *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (quoting *Medina v. California*, 505 U.S. 437, 449 (1992) (interpreting state law)).

    At the competency hearing, this Court ultimately placed the burden on the Government to

prove Allen's competency.  Nevertheless, given the great uncertainty in the law, this Court notes that its competency determination is not dependent upon the allocation of the burden since the evidence is not in equipoise.

## II.    The Defendant Suffers From Mental and Physical-Related Deficiencies.

Based upon the evidence, the undersigned concludes that Allen suffers from a depressive disorder[6] and linguistic difficulties associated with his deafness.  Both Dr. Brannon and Dr. Lisa Feldman diagnosed Allen with a depressive disorder.  Dr. Brannon assigned Allen a diagnosis of "Major Depressive Disorder," while Dr. Lisa Feldman diagnosed Allen with a "Depressive Disorder" but she did not otherwise classify the disorder.   During his interviews with Dr. Brannon and/or Dr. Lisa Feldman, Allen exhibited symptoms such as depressed mood, irritability, social isolation, and difficulty with sleeping and eating.  The medical diagnosis of depression is consistent with the unsanitary living conditions that law enforcement observed at the time of his arrest and the history of depression in his pre-adult years that his brother reported. While Dr. David Feldman did not observe diagnosable depression, he does not dispute the other experts' diagnoses because, he testified, it is not uncommon for there to be different diagnoses based upon different examinations since depression is a mood disorder.

In addition to depression, Allen suffers from linguistic difficulties associated with his deafness.  In particular, Allen has difficulty understanding legal concepts because there are no corresponding signs for many legal terms in ASL.  Both Dr. Brannon and Dr. David Feldman opined that Allen suffers from linguistic difficulties associated with legal proceedings, and while

---

[6] While the Court concludes that Allen suffers from a depressive disorder, there is insufficient evidence in the record regarding the various classifications of the disorder for the Court to determine which classification is appropriate.

Dr. Lisa Feldman did not specifically assign such a diagnosis, she recognized in her evaluation report Allen's lower level of linguistic ability and recommended that individuals working with Allen use simple language.

Section 4241 of Title 18 of the United States Code, which governs mental competency to stand trial, contemplates that the defendant is suffering from a "mental disease or defect" that renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. 18 U.S.C. § 4241. While neither deafness nor the linguistic difficulties associated with deafness constitute a mental defect *per se*, courts have recognized that a physical disability may render a defendant incompetent to stand trial. *United States v. McFall*, No. 07-411, 2011 WL 465718, at *9 (W.D. Pa. Feb. 4, 2011) (finding defendant with severe hearing problems competent to stand trial, but recognizing that "[c]ourts may consider whether a physical disability renders a defendant mentally incompetent under § 4241 and *Dusky*" (citing *United States v. Jones*, 495 F.3d 274, 277 (6th Cir. 2007))); *United States v. Jones*, No. 1:13-CR-226, 2008 WL 5204063, at *3 (E.D. Tenn. Dec. 11, 2008) (finding defendant with severe hearing problems incompetent to stand trial); *c.f. United States v. Schaffer*, 433 F.2d 928, 930 (5th Cir. 1970) ("Courts have recognized that a defendant who is 'mentally competent' within the meaning of 18 U.S.C. § 4244 et seq. may yet be 'physically incompetent'- unable, by virtue (for example) of a painful physical condition or the temporary effects of narcotics, to participate effectively in his own defense." (citing cases)). The courts reason that the due process considerations underlying § 4241 and *Dusky* extend to defendants whose physical disabilities may render them mentally incompetent to stand trial. *See Jones*, 2008 WL 5204063, at *3; *see also Pate v. Robinson*, 383 U.S. 375, 378 (1966) ("[T]he

39

conviction of an accused person while he is legally incompetent violates due process."); *United States v. Swanson*, 572 F.2d 523, 526 (5th Cir. 1978) (stating that "§ 4244 [the precursor to § 4241] enforces the due process requirement that no person be convicted of a crime while he is incompetent to stand trial"). The Court notes, however, that it will be the unusual case that a physical disability will affect an individual's mental capacity. The circumstances presented in *Jones*, where the defendant's severe hearing problems, coupled with a very minimal ability to understand sign language, rendered him mentally incompetent to stand trial, represent the exception rather than the rule.

Although the evidence establishes that Allen suffers from depression and linguistic difficulties associated with his deafness, the question remains whether those disabilities affect his mental competency to stand trial. *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." (citation and internal quotation marks omitted)).

## III.   Despite his Deficiencies, the Defendant is Competent To Stand Trial.

All three of the experts assigned Allen various diagnoses, but they disagree as to whether one or more of those diagnoses interferes with his competency to stand trial. In the view of Dr. Lisa Feldman, none of the diagnoses she assigned Allen affects his competency to stand trial. Dr. Lisa Feldman based her competency opinion, in part, on Allen's performance on three objective competency tests, including the CAST-MR. She found that Allen demonstrated a sufficient factual and rational understanding of the proceedings and the capacity to assist his attorney in his own defense. She recommended that given Allen's recalcitrance toward legal proceedings, low

frustration level, and unfamiliarity with the legal process, individuals working with Allen use basic legal terminology, frequent repetitions, and time to redirect his attention.

The Defendant's experts, Dr. Brannon and Dr. David Feldman, opined that Allen is not competent to stand trial. Dr. Brannon based his opinion on Allen's performance on the MacArthur test and his responses during the clinical interview. Dr. Brannon opined that Allen has an acceptable level of factual understanding about the proceedings, but lacks the reasoning and appreciation skills to apply that understanding to the facts of his case. He also opined that Allen lacks familiarity with legal terminology and feared that Allen's depression would interfere with his ability to consult with counsel. Dr. David Feldman, who knows ASL and has experience working with the deaf, attributed Allen's incompetency solely to his lack on familiarity with legal terminology and concepts. He testified on cross-examination that he believes that Allen has the ability to understand and apply legal concepts if they are adequately explained to him. Both of the Defendant's experts recommended that Allen attend competency restoration training by a psychologist familiar with the deaf culture and the problems experienced by deaf individuals in the legal system, and Dr. David Feldman further recommended that the psychologist be proficient in ASL.

## A.    This Court Credits Dr. Lisa Feldman's Overall Opinion on Competency.

After carefully weighing the opinions of the experts and the other evidence in the record, this Court credits Dr. Lisa Feldman's opinion that Allen is competent to proceed to trial. Dr. Lisa Feldman's forensic evaluation presents an internally coherent and consistent opinion on competency and makes reasonable and realistic recommendations to address Allen's deficiencies. In addition, Dr. Lisa Feldman presents the most comprehensive evaluation of Allen's

competency, which included intellectual functioning testing and three legal competency tests, and spent the most time with Allen—no less than six hours of face-to-face meeting time and twelve total hours of evaluation. *See Battle*, 419 F.3d at 1299 (finding no error in a district court's decision to credit the government's witness, who had evaluated the defendant over a longer and more consistent period of time).

In terms of the coherency of her competency opinion, Dr. Lisa Feldman's choice of objective competency tests reflects her observations about Allen's linguistic ability. Dr. Lisa Feldman acknowledged in her evaluation report that Allen has a lower level of linguistic ability, but opined that she did not find any significant mental impairments relating to Allen's cognitive or decisional-making skills. Correspondingly, Dr. Lisa Feldman administered the CAST-MR and the GCCT-MSH, which are better suited to Allen's lower level of linguistic ability than the MacArthur test, and Allen scored within an acceptable range on both tests. Consistent with her findings, Dr. Lisa Feldman found Allen to be competent but recommended that individuals working with Allen use basic language and repetition, and allow extra time to redirect his defiant behavior.

Dr. Brannon, on the other hand, determined that Allen faces linguistic challenges, but then contradictorily administered the MacArthur test, a competency test that contains an admittedly complicated fact pattern, as well as complicated questions, and a great deal of language. More fundamentally problematic, this Court has had great difficulty squaring Dr. Brannon's diagnosis of linguistic incompetence with his opinion that Allen lacks reasoning and appreciation skills. Other than to report the results of the MacArthur test, Dr. Brannon did not offer an explanation as to why Allen's linguistic challenges affect those skills in particular. Even

Dr. David Feldman recognized that Allen's competency problems relate more to his lack of knowledge of legal concepts than any separate cognitive or decisional-making deficiency. The Court suspects that Allen's poor performance on the Reasoning and Appreciation domains of the MacArthur test is more attributable to his linguistic deficiencies and/or the difficulty of the test itself rather than any significant deficits with respect to his reasoning and appreciation skills that cannot be corrected.

In addition to the internal coherency of her opinion, this Court finds that Dr. Lisa Feldman's competency opinion accommodates Allen's linguistic difficulties and behavioral characteristics in a way that reflects his demonstrated capabilities. Dr. Lisa Feldman recommended that individuals working with Allen use basic language and allow time for Allen to redirect his attention to the matter at hand. The weight of the evidence establishes that Allen has the present capacity to understand and apply legal concepts through the use of basic terminology, explanations, and examples, along with the aid of an ASL interpreter. His acceptable performance on the CAST-MR and GCCT-MSH is evidence of that. Likewise, Allen's behavior during his examinations demonstrates that Allen has the ability to redirect his train of thought and correct his behavior with prompting. Both Dr. Lisa Feldman and Dr. David Feldman testified that they were successfully able to redirect Allen's attention when his thoughts became tangential or he asserted defiant behavior. For these reasons, this Court believes that Dr. Lisa Feldman's recommendations are appropriate and likely to address Allen's demonstrated deficiencies.

This Court is not persuaded by Dr. David Feldman's testimony that Allen will likely not be competent to stand trial save upon completion of a competency restoration training

43

administered by a psychologist who knows the deaf culture and ASL.  This Court is confident in defense counsel's ability to break down legal concepts into understandable terms through the use of explanations and examples, and an appropriately-certified ASL interpreter's ability to translate defense counsel's communications into ASL.  To hold that Allen, who has a good command of ASL and is not significantly mentally-impaired, requires competency restoration training by a psychologist who knows the deaf culture and ASL would dramatically lower the standard of incompetency and render a substantial number of the deaf population incompetent to stand trial.  This Court declines to endorse such a result.

The Court is cognizant of the defense experts' criticisms associated with Dr. Lisa Feldman's use of the CAST-MR in this case, but is not convinced that the results of the test are necessarily invalid or, more importantly, that her use of the test invalidates her opinion as a whole.  The Defendant's experts criticized Dr. Lisa Feldman's use of the CAST-MR on Allen.  Both testified that the CAST-MR is not appropriate for individuals who are not mentally retarded, although they could not articulate their reasoning with any precision.  The Court can surmise that administration of the CAST-MR to Allen, who has borderline intellectual functioning but is not mentally retarded, might produce an unreliable result in that his higher IQ might mask his competency deficits.  While that is certainly a concern to the Court, it would require the Court to engage in unsupported speculation, and, in any event, Dr. Lisa Feldman also administered two other competency assessments on which Allen obtained acceptable scores.  Dr. Lisa Feldman also administered the GCCT-MSH and the CQ, both of which are not designed for a specialized population and both on which Allen obtained acceptable scores.  Although Dr. Brannon criticized the GCCT-MSH for its heavy reliance on factual information as opposed to a

44

defendant's skills to assist counsel and decisional-making skills, Dr. Brannon also admitted that the GCCT-MSH is more difficult than the CAST-MR. Allen's acceptable scores on the GCCT-MSH indicate to the Court that Allen can understand legal proceedings despite his linguistic challenges, which, in the Court's view, represent Allen's greatest deficiency.

Finally, the Court cannot credit the Defendant's experts' opinions that Allen's computer-related knowledge and abilities have no relevance to his competency to stand trial. The evidence presented at the hearing demonstrates that Allen is proficient in other aspects of his life. Allen has the ability to use a personal computer and the internet and navigate his way through a file-sharing network. Although there is a possibility that Allen had assistance with some computer tasks, Allen's daily use of a personal computer and file-sharing network demonstrates some degree of mental capacity to apply complex procedures despite his linguistic limitations. *See McFall*, 2011 WL 465718, at *13 (considering defendant's proficiencies in using his computer and the internet as relevant to the competency determination); *United States v. Doshier*, No. CR-09-042-RAW, 2009 WL 2230789, at *2 (E.D. Okla. July 23, 2009) (considering defendant's use of personal computer as relevant to his mental capacity to comprehend the proceedings). To be clear, Allen's computer proficiencies do not lessen the import of the evidence showing that he has linguistic difficulties with legal terms. Rather, Allen's computer proficiencies simply provide evidence that he has the capacity to follow and apply a web of complex procedures, and there is no evidence to suggest that Allen cannot apply those skills to the task of learning and digesting legal concepts with the aid of competent representation, an interpreter who knows ASL, and their collaborate effort.

In summary, after carefully weighing the experts' opinions and all of the evidence, this

Court credits Dr. Lisa Feldman's opinion that Allen is competent to stand trial. As more fully

discussed below, this Court finds that Allen has a rational and factual understanding of the

proceedings and an ability to assist counsel with his defense.

**B.      The Defendant Has a Rational as Well as Factual Understanding of the
         Proceedings Against Him.**

Allen has a rational and factual understanding of the proceedings against him. All three

of the experts who conducted competency evaluations concluded that Allen is able to identify the

child pornography charges against him. Allen understands that he is being charged with viewing

"naked pictures." The three experts also agreed that Allen is able to identify the participants in

the courtroom and their basic functions. Allen knows the roles of the judge, the jury, the witness,

the defense attorney, and the prosecuting attorney. For example, Allen understands that the judge

is responsible for imposing the sentence, and that the jury "says if you are guilty or not guilty."

He understands that the prosecutor is "against me" and that the defense attorney "works on my

case and supports me." Although Dr. Brannon testified that Allen was unable to explain how the

various courtroom participants work together during the trial and how a determination is made

despite ten minutes of explanation, an advanced understanding of courtroom procedure is not

required to establish competency. *See United States v. Rodriguez-Leon*, 402 F.3d 17, 23 (1st Cir.

2005) (affirming the district court's competency finding and noting that while the "[defendant]

could offer only a simplistic description of court proceedings, . . . he nonetheless could

understand the roles of court proceedings and officials"); *United States v. Jones*, No.

2:07cr280-MHT, 2009 WL 1956388, at *1-2 (M.D. Ala. July 8, 2009) (finding that the defendant

was able to accurately define the roles of various courtroom personnel and stating by way of

example that he understood that the judge "listens to the testimony," the jury "vote if guilty or not," the defense attorney's role is to "defend me, state my case," and the witnesses "tell about the case as they know it").

Allen also expressed a rudimentary understanding of the adversarial nature of courtroom proceedings.  He understands the adversarial nature of the roles of the prosecutor and the defense attorney.  It is true that Allen has difficulty understanding several legal concepts, such as "no contest," and "rights," and the weight of the evidence demonstrates that Allen is not be familiar with these legal terms because they have no direct translation in ASL.  However, the standard of legal competency does not require knowledge of "the legal terms and vernacular of attorneys and judges." *McFall*, 2011 WL 465718, at *13.  Rather, the test for competency is whether a defendant has a "rational and factual understanding" of the trial and can consult with his attorney. *Id.*  As Dr. David Feldman admitted on cross-examination, Allen has the capacity to understand the meaning of legal concepts if they are adequately explained to them, which the doctors did not attempt to do in any comprehensive way. *See United States v. Wiggin*, 429 F.3d 31, 35 (1st Cir. 2005) (affirming finding of competency despite the fact that the defendant was unable to define several legal terms when first asked, where after the defendant was explained the meaning of the terms, the defendant was able to recall the definitions); *see also United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993) ("Even perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency."); *United States v. Glover*, 596 F.2d 857, 867 (9th Cir. 1979) ("The fact that a defendant might not understand the proceedings unless they are explained to him in simple language would put additional burdens on counsel, but certainly

does not establish that the defendant is incompetent to stand trial.").

Further, there is no indication in the record that Allen could not engage in a rational discussion and weighing of the legal options available to him if provided an adequate explanation of his available options in layman's terms. For example, other than the results of the MacArthur test, which may be skewed due to the difficulty of the test itself, there is no evidence in the record that Allen lacks the ability to rationally and accurately perceive, interpret, and respond to legal information or presently has an impaired sense of reality about his case. *See Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1992) ("A defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him."); *United States v. Hemsi*, 901 F.2d 293, 296 (2d Cir. 1990) (noting that defendant had intellectual understanding of charges against him but an impaired sense of reality that substantially undermined his rational judgment). On the contrary, the record reflects that Allen has the demonstrated ability to weigh options and make strategic decisions, as evident from his decisions regarding the following: (1) his choice of GigaTribe, a file-sharing program, because its servers are located overseas; (2) the reformatting of his computer in an apparent, albeit unsuccessful, effort to delete evidence of child pornography from his computer; and (3) the consideration of different modes of transportation based upon cost considerations. The Court is aware that a decision to go to trial or plead guilty is more nuanced than these examples, but his acceptable performance on the CAST-MR and the testimony of Dr. Lisa Feldman and Dr. David Feldman indicate to the Court that Allen has the capacity to apply that decisional-making ability within the context of a legal proceeding.

Allen also expressed at least a basic understanding of the consequences he could face as a

result of these proceedings. He understands that he could face prison time if convicted, and that the sentence could be for a lengthy period of time. Although Allen did not appear to have had prior knowledge of the potential range of the sentence, that fact is not material to the competency determination. *See United States v. Sonnenberg*, No. 1:06-cr-078, 2007 WL 1140458, at *2 (D.N.D. Apr. 17, 2007 (finding that defendant was competent "[even] though he indicated that he has not had any specific conversations with his attorney regarding statutory guidelines for sentencing in his case"). Significant to the competency determination, rather, is Dr. David Feldman's testimony that if someone were to effectively explain to Allen the potential range of the sentence, Allen would likely be able to understand the range of penalties he faces.

Also not inimical to a competency finding is Allen's belief that one possible outcome of the proceedings against him is that he might be able to "go home." However unlikely, given the weight of the evidence in this case, a jury verdict of not guilty remains a possibility, and a defendant's misunderstanding of the remoteness of that possibility does not demonstrate his incompetency, particularly in this case where Allen's lack of understanding relates merely to ASL translation problems. *See United States v. Hernandez-Garcia*, No. 8:03CR59, 2004 WL 1179452, at *2 (D. Neb. May 27, 2004) (affirming magistrate judge's denial of motion to reconsider competency in case where defendant "expressed an interest in pleading not guilty because he hadn't done anything" and "stated his belief that if he were found not guilty be reason of insanity, 'nothing would happen, [he] could go home'"). Importantly, there is no evidence that Allen is operating under any kind of immutable delusion or faulty perception about the consequences of the proceedings that cannot be removed after careful and competent counsel.

In addition to the foregoing, this Court also finds very persuasive the fact that Allen never

interrupted the competency hearing to indicate his inability to understand the proceedings, nor

did the interpreter indicate that Allen had any trouble understanding the sign language. This case

is therefore unlike *Jones*, where the defendant frequently interrupted the proceedings because he

could not understand the sign language and the interpreter indicated several times that the

defendant was not understanding the sign language. *Jones*, 2008 WL 5204063, at *3-5

(concluding that defendant who had severe hearing problems and a minimal ability to understand

sign language was incompetent to stand trial); *see also McFall*, 2011 WL 465718, at *12

(concluding that a hearing-impaired defendant was competent with the aid of reasonable

accommodations and noting that the defendant had interrupted the hearing only three times).

Based upon the foregoing, this Court finds that the Government has met its burden of

showing that Allen has a rational as well as factual understanding of the proceedings against him.

## C.    The Defendant has Sufficient Present Ability to Consult with His Lawyer with a Reasonable Degree of Rational Understanding

Allen has a sufficient present ability to consult with his lawyer with a reasonable degree

of rational understanding. Specifically, Allen has the ability to communicate and disclose

pertinent information to his attorney, exhibit appropriate courtroom behavior, and testify

relevantly. Conversely, as discussed in greater detail below, Allen's thought-processes are not so

grossly disorganized, nor his understanding of his attorney's role or ability to comprehend legal

concepts so inadequate, as to preclude his ability to consult with his attorney.

Considering the evidence as a whole convinces this Court that Allen exhibited generally

organized thought-processes, which became tangential at times but are susceptible to control. At

one extreme Dr. Lisa Feldman reported that Allen exhibited "organized, rational, sequential, and

coherent thought processes," (Gov.'s Ex. 13, Dr. Lisa Feldman's Forensic Evaluation at 11), and

at another extreme Dr. Brannon testified that Allen exhibited disorganized thought-processes and

that he rambled, contradicted himself, and became easily-side tracked.  The weight of the

evidence indicates that Allen's thought-processes lies somewhere in between these two views.

Dr. Thomas reported that Allen exhibited linear, yet circumstantial though processes at time.  (*Id.*

at 12.)  Dr. Hamilton reported that Allen exhibited "organized and goal-directed though-

processes; yet became tangential, at times." (*Id.* at 10.)  Similarly, Dr. David Feldman admitted

that Allen was generally able to answer questions in a logical and consistent manner, and during

the times that he started discussing irrelevant matters, Dr. David Feldman was able to redirect

Allen to the topic at hand.  Hence, the weight of the evidence suggests that Allen's thought-

processes are tangential only at times. *See Doughty v. Grayson*, 397 F. Supp. 2d 867, 878 (E.D.

Mich. 2005) ("That the petitioner's mental illness caused him some diminished ability to

concentrate in general does not mean that he was not competent.").

Moreover, while Allen may be prone to tangential thought, the evidence also shows that

Allen has the ability to redirect his thought-processes.  As noted above, Dr. David Feldman

testified that when Allen veered off-topic, he was able to redirect Allen to the topic at hand.  This

evidence suggests that Allen has the ability to control his thought-processes and engage in a

logical, organized discussion of his case with counsel. *United States v. Simpson,* 645 F.3d 300,

306 (5th Cir. 2011) ("A defendant who has it within his voluntary control to cooperate, is not

incompetent merely because he refuses to cooperate." (internal citation, quotation marks,

brackets, and ellipsis omitted)); *United States v. Armstrong*, No. 1:07-cr-26-SJM, 2009 WL

2880933, at *24, 36, 42 (W.D. Pa. Sept. 8, 2009) (finding that defendant had been restored to

competency despite tangential thought and flight of ideas because the defendant had sufficient control over these behaviors such that she can frequently, if not uniformly, be redirected). Allen's ability to control his tendency toward tangential thought-processes might account for the extreme views taken by Dr. Brannon, who observed disorganized thinking, and Dr. Lisa Feldman, who did not.

For similar reasons, Allen's depression-related symptoms of moodiness and irritability, while perhaps distracting and time-consuming, would not interfere with Allen's capacity to assist counsel with a reasonable degree of rational understanding. The evidence shows that while in prison, during his interviews with the examining doctors, and during his discussions with his attorney, Allen exhibited variable behavior, ranging from cooperative and curious to irritable and emotional. Also evident from the record, however, is Allen's ability to recognize the inappropriateness of his lack of cooperation and correct his behavior after prompting. During one examination with Dr. Lisa Feldman, for example, Allen apologized for his resistant behavior at their last meeting and agreed to participate in the examination. Due to Allen's low frustration tolerance, Dr. Lisa Feldman suggested that anyone working with Allen "allow time to redirect the defendant's volitional defiance." (Gov.'s Ex. 13, Dr. Lisa Feldman's Forensic Evaluation at 19.) As with his tangential thought-processes, Allen's recalcitrance can be controlled and redirected with patience and time, such that it would not interfere with his ability to assist counsel.

In addition to his tendency toward tangential thought-processes and depressed mood, this Court has given serious consideration to Allen's linguistic difficulties. Allen's linguistic difficulties present the greatest hurdle to his ability to assist counsel since they cannot be alleviated through mere self-control or redirection by counsel. This Court gives credit to the

concerns of defense counsel, who undoubtedly has Allen's best interests at heart and understands
how difficult it will be to adequately defend him given his limitations. But this Court is
persuaded by the opinions of Dr. Lisa Feldman and Dr. David Feldman that Allen has the
capacity to understand complex legal concepts if they are adequately explained to him using
language he understands. Moreover, "the caselaw [sic] recognizes that severely hearing and
cognitively impaired people may be competent to stand trial when the appropriate
accommodations are made." *McFall*, 2011 WL 465718, at *13; *see also United States v. May*,
No. 06-40005-01-JAR, 2008 WL 4974829, at *3 (D. Kan. Nov. 19, 2008) (indicating that the
court would make accommodations for defendant suffering from cognitive impairments, such as
frequent breaks, ongoing monitoring of his sedation-causing medications, and questions and
proceedings explained in simple terms, to be addressed more specifically at the limine conference
to be held before trial).

The appropriate accommodations in this case must start with the aid of an appropriately
certified interpreter. Allen has a strong command of ASL and the capacity to understand the
meaning of legal concepts if they are adequately explained to them. Thus, to ensure that Allen
can assist his counsel, all discussions between Allen and his counsel shall be through the use of
an appropriately certified ASL interpreter. Through the use of such an interpreter, defense
counsel will need to explain legal concepts to Allen through simple words and examples, rather
than using the legal vernacular of attorneys. In addition, defense counsel may need to move
slowly and afford Allen breaks. This Court is sensitive to the fact that Allen's linguistic
deficiencies may make communication with his defense counsel more difficult and may place
additional responsibilities on counsel. However, neither those deficiencies nor the imposition of

those burdens render Allen incompetent to proceed. *See United States v. Robinson*, 253 F.3d 1065, 1068 (8th Cir. 2001) ("Although Robinson's cognitive deficits may have placed additional responsibility on his counsel to ensure Robinson's understanding of the process, it certainly does not establish that he was incompetent to stand trial."); *McFall*, 2011 WL 465718, at *13 (concluding that "the auditory and cognitive accommodations . . . will permit defendant to consult with his lawyer with a reasonable degree of rational understanding"); *United States v. Jackson*, No. CRIM. 03-173-04, 2005 WL 2495847, at *7 (E.D. Pa. Oct. 7, 2005) ("The defendant appears to see no benefit in cooperating with anyone involved in the proceedings, including his attorneys. . . . [A]lthough it may be difficult to communicate with the defendant, the court finds that the defendant's depression does not render him unable to consult with his attorneys."). This Court therefore adopts the recommendations of Dr. Lisa Feldman that individuals working with Allen use basic language to explain legal concepts, use frequent repetition, and allow time to redirect Allen's tangential thought-processes and volitional defiance. In addition, the Court may make reasonable accommodations for Allen at any pre-trial proceedings and at trial, which may include, but are not limited to, the use of appropriately-certified ASL interpreters and the provision of real-time transcription, which could afford Allen opportunities to better understand the proceedings and assist his counsel. *See McFall*, 2011 WL 465718, at *12 (noting in a case in which the court found a hearing-impaired defendant to be competent that "[t]he court also can provide simultaneous transcriptions of the proceedings to defendant if he wishes to review with his attorney statements made at any time during trial").

With the appropriate accommodations in place, Allen has the ability to consult with his

lawyer, and nothing presented in the evidence convinces this Court otherwise. Allen's understanding of his attorney's role in this case, for example, is not so deficient as to render him incompetent. Dr. David Feldman expressed concern that Allen could not elaborate on his attorney's role other than to state that his attorney provides "support." Similarly, Dr. Brannon expressed concern that Allen does not appear to understand the confidentiality of attorney-client communications. However, neither expert testified that Allen does not have the capacity to understand the role of his attorney and the confidentiality of the communications if provided further explanation. In any event, no more than a rudimentary understanding of the role of the defendant's attorney is necessary to establish competency. *See Hernandez-Garcia*, 2004 WL 1179452, at *2 (finding defendant competent despite inability to grasp the concept of attorney-client confidentiality).

Likewise, Allen's alleged misunderstanding of the evidence against him does not establish his inability to assist counsel or understanding the proceedings. Dr. David Feldman testified that Allen had misconceptions about the government's case against him. Allen was under the mistaken impression that the government could not have seized any evidence against him because he had deleted all of the child pornography files on his computer as part of a reformatting of his computer. However, Allen's mistaken impression may be more attributable to his overconfidence in his ability to delete computer files and underestimation of the abilities of a forensic examiner than any misunderstanding about the concept of evidence.

Also not determinative of his ability to assist his counsel is the fact that Allen has expressed frustration with his attorney. As stated by the Eleventh Circuit, a defendant's exhibition of "an antagonistic relationship with his lawyers over their representation of him is no

55

indicator of incompetency." *Battle*, 419 F.3d at 1299. In addition, the Court notes that Allen's agitation in the presence of his attorney occurred when his attorney began discussing legal concepts with him. *Cowans v. Bagley*, 624 F. Supp. 2d 709, 754 (S.D. Ohio 2008) ("[D]isruptive behavior alone, especially when prompted by anger at certain aspects of the proceedings against him as opposed to mental disease or defect, is insufficient to establish a defendant's incompetency or even necessarily raise questions as to his competency."), *aff'd*, 639 F.3d 241 (6th Cir. 2011). Allen's anger appears to be related to certain aspects of these proceedings or his inability to understand the legal terminology rather than any defect that cannot be accommodated. The Court suspects that as Allen gains a better understanding of the legal proceedings, his frustration level will correspondingly decrease.

In addition, this Court does not believe that the mere fact that Dr. Brannon observed Allen interacting with his attorney necessarily renders Dr. Brannon's opinion more persuasive. Dr. Lisa Feldman observed Allen's tangential thought-processes, moodiness, and expressions of frustration, but concluded that in most cases Allen had the ability to engage in a coherent discussion about his case and control those behaviors through prompting and redirection. Drawing inferences from those observations, Dr. Lisa Feldman opined that Allen has the ability to assist counsel with his own defense. This Court is entitled to rely upon Dr. Lisa Feldman's opinion despite the fact that only Dr. Brannon was able to observe Allen interact with his attorney. *See United States v. Bradley*, 644 F.3d 1213, 1269 (11th Cir. 2011) (rejecting the defendant's argument that "the district court should have relied upon his expert's report because only his doctor . . . was able to see him interact with his attorneys").

Finally, Allen's ability to consult with counsel is further buttressed by the fact that Allen

has the demonstrated ability to exhibit appropriate courtroom behavior. All three of the experts who completed competency evaluations of Allen agree that Allen can exhibit appropriate courtroom behavior, although Dr. Brannon qualified that he could do so only if not "bothered." The Court had the opportunity to observe Allen's behavior during the two-day competency hearing, which lasted approximately thirteen hours. During that entire time, Allen behaved appropriately. Allen remained focused on the proceedings, was calm and not disruptive, and appeared undisturbed by potentially harmful testimony and documentary evidence. Hence, based upon the evidence in the record, the Court concludes that Allen has the ability to exhibit appropriate courtroom behavior.

For all of the above-stated reasons, this Court concludes that Allen has the ability consult with his counsel with a reasonable degree of rational understanding.

## RECOMMENDATION TO THE DISTRICT COURT

After considering all of the evidence adduced at the hearing and the arguments of counsel, this Court **RECOMMENDS** that the District Court find, by a preponderance of the evidence, that Defendant Robert Allen is **NOT** "presently suffering from a mental disease or defect rendering him incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d); and he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Rahim*, 431 F.3d at 760. As such, this Court **RECOMMENDS** that the District Court find that Defendant Don Robert Allen is **COMPETENT** to stand trial.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Kenneth L. Ryskamp, Senior United States District Court Judge for the Southern District of Florida, within fourteen (14) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982). Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. *See LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE and SUBMITTED** in Chambers this 26 day of August, 2011 at West Palm Beach in the Southern District of Florida.

James M. Hopkins

_____
JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Hon. Kenneth L. Ryskamp, Senior United States District Court Judge
Counsel of Record

58